# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| THYSSENKRUPP MATERIALS NA, INC. d/b/a ThyssenKruppMaterials Trading North America and THYSSENKRUPP MATERIALS TRADING NA LLC, | ) ) ) ) | Case No. 1:23-cv-3086-SJC-JTG |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| M/V DRAWSKO, her engines, boilers, tackle, etc., *in rem,* PEGASUS DENIZCILIK A.S.; POLSKA ZEGLUGA MORSKA; ERATO TWO SHIPPING LTD.; NORTH AMERICA STEVEDORING COMPANY, LLC, *in personam*; | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### PLAINTIFF'S DECLARATION OF MARC BOETNNER
### IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [DKT. 49]

MARC BOETTNER, pursuant to 28 U.S.C. §1746, hereby declares as follows:

1. I am currently the operating manager for THYSSENKRUPP MATERIALS TRADING NA, LLC d/b/a ThyssenKruppMaterials Trading North America and submit this declaration in opposition to Defendants POLSKA ZEGLUGA MORSKA P.P. and ERATO TWO SHIPPING LIMITED (collectively hereinafter referred to as "Owners") Motion to Dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. Pro. Rule 12(b)(3).

2. Plaintiffs THYSSENKRUPP MATERIALS NA, INC. d/b/a ThyssenKruppMaterials Trading North America and THYSSENKRUPP MATERIALS TRADING NA LLC are importers and traders of steel products with its Houston office, located at 2700 Post Oak Road, Suite 1100, Houston, TX 77056.

1

3. On or about March 25, 2022, Plaintiffs purchased 123 cold rolled steel coils (hereinafter referred to as "the Cargo") from a steel mill called Borcelik Celik Sanayii Ticaret A.S. on CFR FO (according to Incoterms 2010) terms, meaning that the mill bore the cost of ocean transportation to Chicago, Illinois. *See* Commercial Invoices Nos. BORC-12881 dated March 25, 2022, BORC-12850 dated March 25, 2022, BORC-12845-C dated March 25, 2022, BORC-12845-B dated March 25, 2022 and BORC-12845-A dated March 25, 2022, annexed hereto as Exhibit "A".

4. As the Cargo was purchased via letter of credit, negotiable bills of lading were required to be presented to Plaintiffs' bank for payment. Such bills of lading for the motor vessel "DRAWSKO" (hereinafter referred to as "the Vessel") were presented to Plaintiffs' bank with the stamp of Charterers' agent, A&Z Shipping Agency in Turkey, and was further endorsed by Plaintiffs, whose stamp appears on the backside of each bill of lading. *See* Bills of Lading Nos. PDEK2205GMCH0002, 3, 4, 5 and 10 dated March 25, 2022, annexed hereto as Exhibit "B".

5. While it is alleged that defendant POLSKA ZEGLUGA MORSKA P.P. ("Owner") entered into a time charter dated February 23, 2022, with defendant PEGASUS DENIZCILIK AS ("Charterer") (*see* Declaration of Artur Witkowski dated August 11, 2023, Exh. "1" [Doc. #20-2]), it also appears that Charterer in turn entered into a separate voyage charter with non-party BORUSAN LOJISTIK. We do not have a copy of this charter party, only the charter fixture, the terms of which were forwarded via email to Plaintiffs' counsel on or about February 1, 2023, annexed hereto as Exhibit "C".

6. On May 2, 2023, Owner's counsel represented to Plaintiffs' counsel that another charter party dated May 5, 2021 had been incorporated by reference into the bills of lading. *See*

May 2, 2023 email from Owner's counsel attaching a true and correct copy of said charter party, annexed hereto as Exhibit "D".

7. The existence of possibly three (3) charter parties allegedly being incorporated by reference into the bills of lading only adds to the confusion as to which charter party was in fact incorporated by reference and highlights that the rule requiring a date or some other identifying information concerning the specific charter party is a sensible one which has been repeatedly upheld by federal courts sitting under admiralty and maritime jurisdiction.

8. After discharge, we submitted endorsed bills of lading (Exhibit "B") to the Vessel's agent, and thereupon the Cargo was released to us after arrival in Chicago.

9. Defendant NORTH AMERICAN STEVEDORING COMPANY, LLC ("NASCO") was hired by Plaintiffs to unload the Cargo from the Vessel onto the terminal in Chicago. NASCO issued an OS&D report which documented that the Cargo was wet when it was discharged from the Vessel. *See* NASCO Over/Short & Damage Report dated May 27, 2022, annexed hereto as Exhibit "E" ("Exceptions include minor packaging damages, condensation, gouging on a small number of coils as a result of tight stow, and inner ring displacement."). However, we cannot rule out the possibility that the Cargo suffered further loss or damage while in the exclusive care, custody and control of NASCO.

10. We then arranged for the delivery of the Cargo to our customers, Charter Steel Trading Co. and Mainline Metals Inc., who both rejected the Cargo because of rust damage.

11. I hereby attest that the subject bills of lading, attached hereto as Exhibit "B", are the only bills of lading which were known and employed by Plaintiffs in the purchase and receipt of the Cargo.

12. Plaintiffs were never a party to: (a) Owner's time charter [Doc. #20-2, Exh. "1"]; (b) Charterer's voyage charter (Exh. "C"); or (c) Owner's May 1, 2021 time charter ("Exh. "D"), and never received any of these three (3) documents prior to the commencement of the voyage from Gemlik, Turkey. We had no knowledge of any of these documents until after delivery of the Cargo to our customers in the U.S. and our counsel initiated a claims process for recovery against Vessel Interests.

13. Plaintiffs never negotiated the terms and conditions of the subject bills of lading (Exhibit "B") which are a preprinted form known as "CONGENBILL." Plaintiffs, as the consignees, are never allowed to alter or otherwise edit the form or wording of bills of lading issued by Owners or Charterers (collectively referred to hereinafter as "Vessel Interests"). Stated another way, Vessel Interests unilaterally issued the subject bills of lading (Exhibit "B") for use by Plaintiffs in the purchase and sale of the Cargo, without any input from Plaintiffs on information contained therein.

14. While the CONGENBILL form contemplates being issued in conjunction with a charter party, it is not the case that CONGENBILL bills of lading can only be issued with a corresponding charter party. Indeed, there are two charterparties that could have been incorporated by reference into the subject bills of lading. None of the documents submitted by Owners as support of their motion to dismiss explain why the time charter, rather than the voyage charter, should be considered incorporated by reference. Plaintiffs regularly buy and sell shipments of steel products on CONGENBILL form bills of lading every year without specifying a particular charterparty, either by date or identifying the parties to the charter party. If it was important to Owners or Charterers—for commercial or legal

reasons—to specify which of the three (3) charterparties governed, they or their agents should have ensured that their bills of lading were properly drafted.

15. Thus, Plaintiffs cannot be bound by an Arbitration clause in a Charter Party to which it was never a party and which was not incorporated in the bills of lading which were unilaterally issued to Plaintiffs' supplier. Moreover, Plaintiffs have no knowledge of any of the pages attached to the Declaration of Arthur Witkowski dated August 11, 2023 [Doc. 20-2]. The documents attached to the Declaration of Krzysztof Szczepankowski dated August 11, 2023 [Doc. 20-1] appear to be an unendorsed version of the subject bills of lading and therefore were not utilized in obtaining the release of the Cargo in Chicago.

16. Plaintiffs do not have any direct commercial relationship with any of the other named defendants, PEGASUS DENIZCILIK A.S.; POLSKA ZEGLUGA MORSKA and ERATO TWO SHIPPING LTD.

17. Plaintiffs also do not have an ownership interest in any of the named defendants; nor do Plaintiffs share any of the same owners with any of the named defendants.

18. WHEREFORE, this declarant respectfully requests that Owners' Motion to Dismiss pursuant to Fed. R. Civ. Pro. Rule 12(b)(3) be denied in all respects because the alleged London arbitration clause was set forth in a Charterparty which was not properly incorporated by reference in Exhibit "B," the bills of lading, and we have no prior knowledge or notice of the alleged Charters until long after the voyage.

19. I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2024

_____
MARC BOETTNER

# SUB-EXHIBIT A-1

HTS: 7209.17.0070

# BORÇELİK

## COMMERCIAL INVOICE

| BENEFICIARY NAME | APPLICANT NAME | INVOICE DATE |
|---|---|---|
| BORCELIK CELIK SANAYII TICARET A.S. MECLISI MEBUSAN CAD 103 SALIPAZARI, 34427. ISTANBUL, TURKEY | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA 22355 WEST ELEVEN MILE RO AD SOUTHFIELD, MI 48033 USA | 25.03.2022 |
| | | INVOICE NO |
| | | BORC-12881 |

| VESSEL NAME | TERMS OF DELIVERY |
|---|---|
| MV DRAWSKO | CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 |

| MANUFACTURER | COUNTRY OF ORIGIN |
|---|---|
| BORCELIK CELIK SANAYII TICARET A.S. | TURKEY |

| DESCRIPTION OF THE GOODS | |
|---|---|

BORCELIK CELIK SANAYII TICARET A.S. CONTRACT: BORC-12881

THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505751HM

COVERING SHIPMENT OF 610,370 METRIC TONS (MT OF PRIME COLD ROLLED

STEEL IN COILS AS PER ASTM A1008. QUANTITY TOLERANCE +10% /- 10%.

PRICE AND DELIVERY TERMS: AFOREMENTIONED PRICE TO BE UNDERSTOOD

CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010.

INVOICING: ON ACTUAL NET WEIGHT BASIS

MANUFACTURER: BORCELIK CELIK SANAYII TICARET A.S

| BORCELIK CONTRACT NO. | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NUMBER | ITEM | QUALITY | NUMBER OF COILS | SIZE (INCH) | | THICKNESS TOLERANCE | QUANTITY(MT) | | UNIT PRICE (USD/MT) | TOTAL AMOUNT/ VALUE(USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | THICKNESS (INCH) | WIDTH (INCH) | | TOTAL NET WEIGHT (MT) | TOTAL GROSS WEIGHT MT) | | |
| BORC-12881 | 505751HM | 1 | CS TYPE B | 46 | 0.0290 | 56.175 | MIN | 610,370 | 613,810 | 1.350,00 | 823.999,50 |
| | TOTAL QUANTITY | | | 46 | COILS | | | 610,370 | 613,810 | | 823.999,50 |

| | |
|---|---|
| TOTAL CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 | 823.999,50 |
| TOTAL PAYABLE AMOUNT | 823.999,50 |

## BORÇELİK ÇELİK SANAYİİ TİCARET A.Ş.

**BORÇELİK ÇELİK SANAYİi TİCARET A.Ş.**

**Head Office:** Pürtelaş Hasan Mahallesi, Meclisi Mebusan Caddesi, No:37 Salıpazarı Beyoğlu - İstanbul / Turkey
Sicil No: 260124 Mersis No: 0-1800-0277-8200016
www.borcelik.com

**BORUSAN & ARCELORMITTAL JOINT VENTURE**

**Factory:** Ata Mahallesi, 125 No'lu Sokak, No:1, PK:16601 Gemlik - Bursa / Turkey
Tel : +90 224 280 40 00
Faks : +90 224 519 01 30

# SUB-EXHIBIT A-2

HTS: 7209.16.0070

# ❙❙ BORÇELİK

# COMMERCIAL INVOICE

| BENEFICIARY NAME | APPLICANT NAME | INVOICE DATE |
|---|---|---|
| BORCELIK CELIK SANAYII TICARET A.S. MECLISI MEBUSAN CAD 103 SALIPAZARI, 34427. ISTANBUL, TURKEY | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA 22355 WEST ELEVEN MILE RO AD SOUTHFIELD, MI 48033 USA | 25.03.2022 |
| | | **INVOICE NO** |
| | | BORC-12850 |

| VESSEL NAME | TERMS OF DELIVERY |
|---|---|
| MV DRAWSKO | CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 |

| MANUFACTURER | COUNTRY OF ORIGIN |
|---|---|
| BORCELIK CELIK SANAYII TICARET A.S. | TURKEY |

| DESCRIPTION OF THE GOODS | |
|---|---|

BORCELIK CELIK SANAYII TICARET A.S. CONTRACT: BORC-12850

THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505697HM

COVERING SHIPMENT OF 326,310 METRIC TONS (MT OF PRIME COLD ROLLED

STEEL IN COILS AS PER ASTM A1008. QUANTITY TOLERANCE +/- 10%.

PRICE AND DELIVERY TERMS: AFOREMENTIONED PRICE TO BE UNDERSTOOD

CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010.

INVOICING: ON ACTUAL NET WEIGHT BASIS

MANUFACTURER: BORCELIK CELIK SANAYII TICARET A.S

| BORCELIK CONTRACT NO. | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NUMBER | ITEM | QUALITY | NUMBER OF COILS | SIZE (INCH) | | THICKNESS TOLERANCE | QUANTITY(MT) | | UNIT PRICE (USD/MT) | TOTAL AMOUNT/ VALUE(USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | THICKNESS (INCH) | WIDTH (INCH) | | TOTAL NET WEIGHT (MT) | TOTAL GROSS WEIGHT MT) | | |
| BORC-12850 | 505697HM | 1 | CS TYPE B | 17 | 0.0550 | 60.000 | MIN | 143,570 | 144,675 | 1.285,00 | 184.487,45 |
| BORC-12850 | 505697HM | 2 | CS TYPE B | 9 | 0.0550 | 48.000 | MIN | 81,030 | 81,500 | 1.285,00 | 104.123,55 |
| BORC-12850 | 505697HM | 3 | CS TYPE B | 12 | 0.0440 | 60.000 | MIN | 101,710 | 102,490 | 1.285,00 | 130.697,35 |
| | | | **TOTAL QUANTITY** | **38** | | **COILS** | | **326,310** | **328,665** | | **419.308,35** |

| | |
|---|---|
| **TOTAL CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010** | **419.308,35** |
| **TOTAL PAYABLE AMOUNT** | **419.308,35** |

# BORÇELİK ÇELİK SANAYİİ TİCARET A.Ş.

BORÇELİK ÇELİK SANAYİİ TİCARET A.Ş.

**Head Office:** Pürtelaş Hasan Mahallesi, Meclisi Mebusan Caddesi, No:37 Salıpazarı Beyoğlu - İstanbul / Turkey
Sicil No: 260124 Mersis No: 0-1800-0277-8200016
www.borcelik.com

**BORUSAN & ARCELORMITTAL JOINT VENTURE**

**Factory:** Ata Mahallesi, 125 No'lu Sokak, No:1, PK:16601 Gemlik - Bursa / Turkey
Tel : +90 224 280 40 00
Faks : +90 224 519 01 30

# SUB-EXHIBIT A-3

**HTS CODES**
**ITEMS 1-3: 7209.17.0070**
**ITEMS 4-5: 7209.16.0070**

# BORÇELIK

## COMMERCIAL INVOICE

| BENEFICIARY NAME | APPLICANT NAME | INVOICE DATE |
|---|---|---|
| BORCELIK CELIK SANAYII TICARET A.S.<br>MECLISI MEBUSAN CAD 103<br>SALIPAZARI, 34427.<br>ISTANBUL, TURKEY | THYSSENKRUPP MATERIALS TRADING<br>NORTH AMERICA 22355 WEST ELEVEN<br>MILE RO AD SOUTHFIELD, MI 48033<br>USA | 25.03.2022<br><br>**INVOICE NO**<br>BORC-12845-C |

| VESSEL NAME | TERMS OF DELIVERY |
|---|---|
| MV DRAWSKO | CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 |

| MANUFACTURER | COUNTRY OF ORIGIN |
|---|---|
| BORCELIK CELIK SANAYII TICARET A.S. | TURKEY |

**DESCRIPTION OF THE GOODS**

BORCELIK CELIK SANAYII TICARET A.S. CONTRACT: BORC-12845C

THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505694HM

COVERING SHIPMENT OF 157,680 METRIC TONS (MT OF PRIME COLD ROLLED

STEEL IN COILS AS PER ASTM A1008. QUANTITY TOLERANCE +/- 10%.

PRICE AND DELIVERY TERMS: AFOREMENTIONED PRICE TO BE UNDERSTOOD

CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010.

INVOICING: ON ACTUAL NET WEIGHT BASIS

MANUFACTURER: BORCELIK CELIK SANAYII TICARET A.S

| BORCELIK CONTRACT NO. | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NUMBER | ITEM | QUALITY | NUMBER OF COILS | SIZE (INCH) THICKNESS (INCH) | SIZE (INCH) WIDTH (INCH) | THICKNESS TOLERANCE | QUANTITY(MT) TOTAL NET WEIGHT (MT) | QUANTITY(MT) TOTAL GROSS WEIGHT MT) | UNIT PRICE (USD/MT) | TOTAL AMOUNT/ VALUE(USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BORC-12845C | 505694HM | 1 | CS TYPE B | 1 | 0.0280 | 48.500 | MIN | 20,080 | 20,155 | 1.285,00 | 25.802,80 |
| BORC-12845C | 505694HM | 2 | CS TYPE B | 1 | 0.0280 | 50.500 | MIN | 20,120 | 20,195 | 1.285,00 | 25.854,20 |
| BORC-12845C | 505694HM | 3 | CS TYPE B | 1 | 0.0280 | 48.000 | MIN | 17,320 | 17,390 | 1.285,00 | 22.256,20 |
| BORC-12845C | 505694HM | 4 | CS TYPE B | 2 | 0.0440 | 48.000 | MIN | 40,380 | 40,520 | 1.285,00 | 51.888,30 |
| BORC-12845C | 505694HM | 5 | CS TYPE B | 3 | 0.0550 | 48.000 | MIN | 59,780 | 59,990 | 1.285,00 | 76.817,30 |
| **TOTAL QUANTITY** | | | | **8** | **COILS** | | | **157,680** | **158,250** | | **202.618,80** |

| | |
|---|---|
| TOTAL CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 | 202.618,80 |
| TOTAL PAYABLE AMOUNT | 202.618,80 |

## BORÇELİK ÇELİK
## SANAYİİ TİCARET A.Ş.

**BORÇELİK ÇELİK SANAYİİ TİCARET A.Ş.**
Head Office: Pürtelaş Hasan Mahallesi, Meclisi Mebusan Caddesi, No:37 Salıpazarı Beyoğlu - İstanbul / Turkey
Sicil No: 260124 Mersis No: 0-1800-0277-8200016
www.borcelik.com

**BORUSAN & ARCELORMITTAL JOINT VENTURE**
Factory: Ata Mahallesi, 125 No'lu Sokak, No:1, PK:16601 Gemlik - Bursa / Turkey
Tel : +90 224 280 40 00
Faks : +90 224 519 01 30

# SUB-EXHIBIT A-4

HTS: 7209.17.0070

# BORÇELİK

# COMMERCIAL INVOICE

| BENEFICIARY NAME | APPLICANT NAME | INVOICE DATE |
|---|---|---|
| BORCELIK CELIK SANAYII TICARET A.S. MECLISI MEBUSAN CAD 103 SALIPAZARI, 34427. ISTANBUL, TURKEY | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA 22355 WEST ELEVEN MILE RO AD SOUTHFIELD, MI 48033 USA | 25.03.2022 |
| | | **INVOICE NO** |
| | | BORC-12845-B |

| VESSEL NAME | TERMS OF DELIVERY |
|---|---|
| MV DRAWSKO | CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 |

| MANUFACTURER | COUNTRY OF ORIGIN |
|---|---|
| BORCELIK CELIK SANAYII TICARET A.S. | TURKEY |

| DESCRIPTION OF THE GOODS | |
|---|---|

BORCELIK CELIK SANAYII TICARET A.S. CONTRACT: BORC-12845B

THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505693HM

COVERING SHIPMENT OF 440,380 METRIC TONS (MT OF PRIME COLD ROLLED

STEEL IN COILS AS PER ASTM A1008. QUANTITY TOLERANCE +/- 10%.

PRICE AND DELIVERY TERMS: AFOREMENTIONED PRICE TO BE UNDERSTOOD

CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010.

INVOICING: ON ACTUAL NET WEIGHT BASIS

MANUFACTURER: BORCELIK CELIK SANAYII TICARET A.S

| BORCELIK CONTRACT NO. | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NUMBER | ITEM | QUALITY | NUMBER OF COILS | SIZE (INCH) | | THICKNESS TOLERANCE | QUANTITY(MT) | | UNIT PRICE (USD/MT) | TOTAL AMOUNT/ VALUE(USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | THICKNESS (INCH) | WIDTH (INCH) | | TOTAL NET WEIGHT (MT) | TOTAL GROSS WEIGHT MT) | | |
| BORC-12845B | 505693HM | 1 | CS TYPE B | 9 | 0.0290 | 53.315 | MIN | 192,020 | 192,730 | 1.300,00 | 249.626,00 |
| BORC-12845B | 505693HM | 2 | CS TYPE B | 8 | 0.0385 | 52.035 | MIN | 175,130 | 175,770 | 1.300,00 | 227.669,00 |
| BORC-12845B | 505693HM | 3 | CS TYPE B | 2 | 0.0280 | 60.375 | MIN | 36,600 | 36,770 | 1.285,00 | 47.031,00 |
| BORC-12845B | 505693HM | 4 | CS TYPE B | 2 | 0.0220 | 60.000 | MIN | 36,630 | 36,800 | 1.295,00 | 47.435,85 |
| **TOTAL QUANTITY** | | | | **21** | **COILS** | | | **440,380** | **442,070** | | **571.761,85** |

| | | |
|---|---|---|
| TOTAL CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 | 571.761,85 |
| TOTAL PAYABLE AMOUNT | 571.761,85 |

# BORÇELİK ÇELİK
# SANAYİİ TİCARET A.Ş.

**BORÇELİK ÇELİK SANAYİİ TİCARET A.Ş.**
**Head Office:** Pürtelaş Hasan Mahallesi, Meclisi Mebusan Caddesi, No:37 Salıpazarı Beyoğlu - İstanbul / Turkey
Sicil No: 260124 Mersis No: 0-1800-0277-8200016
www.borcelik.com

**BORUSAN & ARCELORMITTAL JOINT VENTURE**

**Factory:** Ata Mahallesi, 125 No'lu Sokak, No:1, PK:16601 Gemlik - Bursa / Turkey
Tel     : +90 224 280 40 00
Faks    : +90 224 519 01 30

# SUB-EXHIBIT A-5

HTS: 7209.16.0070

# BORÇELİK

# COMMERCIAL INVOICE

| BENEFICIARY NAME | APPLICANT NAME | INVOICE DATE |
|---|---|---|
| BORCELIK CELIK SANAYII TICARET A.S. MECLISI MEBUSAN CAD 103 SALIPAZARI, 34427. ISTANBUL, TURKEY | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA 22355 WEST ELEVEN MILE RO AD SOUTHFIELD, MI 48033 USA | 25.03.2022 |
| | | **INVOICE NO** |
| | | BORC-12845-A |
| **VESSEL NAME** | **TERMS OF DELIVERY** | |
| MV DRAWSKO | CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 | |
| **MANUFACTURER** | **COUNTRY OF ORIGIN** | |
| BORCELIK CELIK SANAYII TICARET A.S. | TURKEY | |
| **DESCRIPTION OF THE GOODS** | | |

BORCELIK CELIK SANAYII TICARET A.S. CONTRACT: BORC-12845A

THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505692HM

COVERING SHIPMENT OF 1309,090 METRIC TONS (MT OF PRIME COLD ROLLED

STEEL IN COILS AS PER ASTM A1008. QUANTITY TOLERANCE +/- 10%.

PRICE AND DELIVERY TERMS: AFOREMENTIONED PRICE TO BE UNDERSTOOD

CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010.

INVOICING: ON ACTUAL NET WEIGHT BASIS

MANUFACTURER: BORCELIK CELIK SANAYII TICARET A.S

| BORCELIK CONTRACT NO. | THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NUMBER | ITEM | QUALITY | NUMBER OF COILS | SIZE (INCH) | | THICKNESS TOLERANCE | QUANTITY(MT) | | UNIT PRICE (USD/MT) | TOTAL AMOUNT/ VALUE(USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | THICKNESS (INCH) | WIDTH (INCH) | | TOTAL NET WEIGHT (MT) | TOTAL GROSS WEIGHT MT) | | |
| BORC-12845A | 505692HM | 1 | CS TYPE B | 19 | 0.0440 | 48.000 | MIN | 371,960 | 373,285 | 1.285,00 | 477.968,60 |
| BORC-12845A | 505692HM | 2 | CS TYPE B | 31 | 0.0440 | 60.000 | MIN | 553,910 | 556,370 | 1.285,00 | 711.774,35 |
| BORC-12845A | 505692HM | 3 | CS TYPE B | 10 | 0.0550 | 48.000 | MIN | 186,240 | 186,925 | 1.285,00 | 239.318,40 |
| BORC-12845A | 505692HM | 4 | CS TYPE B | 11 | 0.0550 | 60.000 | MIN | 196,980 | 197,860 | 1.285,00 | 253.119,30 |
| **TOTAL QUANTITY** | | | | **71** | **COILS** | | | **1309,090** | **1314,440** | | **1.682.180,65** |

| TOTAL CFR FO, CHICAGO, IL, USA ACCORDING TO INCO TERMS 2010 | 1.682.180,65 |
|---|---|
| **TOTAL PAYABLE AMOUNT** | **1.682.180,65** |

## BORÇELİK ÇELİK
## SANAYİİ TİCARET A.Ş.

**BORÇELİK ÇELİK SANAYİİ TİCARET A.Ş.**
**Head Office:** Pürtelaş Hasan Mahallesi, Meclisi Mebusan Caddesi, No:37 Salıpazarı Beyoğlu - İstanbul / Turkey
Sicil No: 260124 Mersis No: 0-1800-0277-8200016
www.borcelik.com

**BORUSAN & ARCELORMITTAL JOINT VENTURE**

**Factory:** Ata Mahallesi, 125 No'lu Sokak, No:1, PK:16601 Gemlik - Bursa / Turkey
Tel : +90 224 280 40 00
Faks : +90 224 519 01 30

# SUB-EXHIBIT B

CODE NAME : "CONGENBILL". EDITION 1994

| Shipper | BILLS OF LADING | BL NO: PDEK2205GMCH0002 |
|---|---|---|

**Shipper**

BORCELIK CELIK SANAYII TICARET A.S.
MECLISI MEBUSAN CAD. 103
SALIPAZARI 34427, ISTANBUL, TURKEY

**BILLS OF LADING**
TO BE USED WITH CHARTER-PARTIES
Reference No. 12845-A

**BL NO: PDEK2205GMCH0002**

**Consignee**

TO THE ORDER OF THYSSENKRUPP
MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI, USA 48033

ORIGINAL

**Notify Party**
GEODIS, THE NAVY YARD, 5101 S. BROAD
STREET, PHILADELPHIA, PA 19112-1404, ATTN: ANN TRAN,
EMAIL: ANN.TRAN@GEODIS.COM

**Master Name :**
TADEUSZ MAJEWSKI

**Notify Party 2 :**
THYSSENKRUPP MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI 48033, ATTN: TARA MONDRO, EMAIL:
TARA.MONDRO@THYSSENKRUPP-MATERIALS.COM'.

| Vessel | Port of loading |
|---|---|
| MV DRAWSKO | GEMLIK PORT,TURKEY |

| Port of discharge |
|---|
| CHICAGO,IL, USA |

| DESCRIPTION OF GOODS | | Net Weight | Gross Weight |
|---|---|---|---|
| PRIME COLD ROLLED STEEL IN COILS<br>THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505692HM | 71 COILS | 1.309,090 MT | 1.314,440 MT |

Freight payable as per charter party

THE VESSEL'S INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER: 9393450
COLOR MARK : YELLOW

(of which ............................ on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsover arising)

| Freight payable as per<br>CHARTER-PARTY dated | SHIPPED at the port of loading in apparent good order and condition on board the vessel for carriage to the |
|---|---|
| | port of discharge or so near thereto as she may safely get the .. goods specified above. |
| FREIGHT ADVANCE.<br>Received on account of freight:<br><br>.................................................... | Weight, measure, quality, quantity, condition, contents and value .. unknown<br><br>IN WITNESS where of the master or agent of the said vessel has signed . the numbers of Bills of Lading indicated below all of this tenor and date,<br>any one of which being accomplished the others shall be void. |
| Time used for loading ............... days ............... hours. | FOR CONDITONS OF CARRIAGE SEE OVERLEAF |

| | Freight payable<br>as per charter party | Place and date of issue<br>GEMLIK, 25.03.2022 |
|---|---|---|
| | Number of original Bs/L<br><br>3 / 3 | Signature<br><br>AS AGENT ON BEHALF OF THE CHARTERER PEGASUS DENIZCILIK A.S |

A&Z Shipping Agency
GEMLIK TURKEY

**BILL OF LADING**

TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994
ADOPTED BY THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.
  (a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

  (b) Trades where Hague-Visby Rules apply.
  In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

  (c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.



CODE NAME : "CONGENBILL". EDITION 1994

| Shipper | | |
|---|---|---|
| BORCELIK CELIK SANAYII TICARET A.S.<br>MECLISI MEBUSAN CAD. 103<br>SALIPAZARI 34427, ISTANBUL, TURKEY | **BILLS OF LADING**<br>TO BE USED WITH CHARTER-PARTIES<br>Reference No. 12845-B | BL NO: PDEK2205GMCH0003 |

**Consignee**

TO THE ORDER OF THYSSENKRUPP
MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI, USA 48033

**Notify Party**

GEODIS, THE NAVY YARD, 5101 S. BROAD
STREET, PHILADELPHIA, PA 19112-1404, ATTN: ANN TRAN,
EMAIL: ANN.TRAN@GEODIS.COM

**Master Name :**
TADEUSZ MAJEWSKI

**Notify Party 2 :**
THYSSENKRUPP MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI 48033, ATTN: TARA MONDRO, EMAIL:
TARA.MONDRO@THYSSENKRUPP-MATERIALS.COM'.

| Vessel | Port of loading |
|---|---|
| MV DRAWSKO | GEMLIK PORT,TURKEY |
| **Port of discharge** | |
| CHICAGO,IL, USA | |

| DESCRIPTION OF GOODS | | Net Weight | Gross Weight |
|---|---|---|---|
| PRIME COLD ROLLED STEEL IN COILS<br>THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505693HM | 21 COILS | 440,380 MT | 442,070 MT |

Freight payable as per charter party

THE VESSEL'S INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER: 9393450
COLOR MARK : BLUE

(of which ................................................ on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsover arising)

| Freight payable as per<br>CHARTER-PARTY dated | SHIPPED at the port of loading in apparent good order and condition on board the vessel for carriage to the |
|---|---|
| | port of discharge or so near thereto as she may safely get the .. goods specified above. |
| FREIGHT ADVANCE.<br>Received on account of freight: | Weight, measure, quality, quantity, condition, contents and value .. unknown |
| ............................................................................. | IN WITNESS where of the master or agent of the said vessel has signed . the numbers of Bills of Lading indicated below all of this tenor and date,<br>any one of which being accomplished the others shall be void. |
| Time used for loading ............ days ............ hours. | FOR CONDITONS OF CARRIAGE SEE OVERLEAF |

| Freight payable<br>as per charter party | Place and date of issue<br>GEMLIK, 25.03.2022 |
|---|---|
| Number of original Bs/L<br><br>3 / 3 | Signature<br>AS AGENT ON BEHALF OF THE CHARTERER PEGASUS DENIZCILIK A.S |

A&Z Shipping Agency
GEMLİK / TURKEY

## BILL OF LADING

TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994
ADOPTED BY THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.

(a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

(b) Trades where Hague-Visby Rules apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

(c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.



CODE NAME : "CONGENBILL". EDITION 1994

| | | |
|---|---|---|
| **Shipper**<br>BORCELIK CELIK SANAYII TICARET A.S.<br>MECLISI MEBUSAN CAD. 103<br>SALIPAZARI 34427, ISTANBUL, TURKEY | **BILLS OF LADING**<br>TO BE USED WITH CHARTER-PARTIES | **BL NO:** PDEK2205GMCH0004<br>Reference No. 12845-C |

**Consignee**

TO THE ORDER OF THYSSENKRUPP
MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI, USA 48033

**Master Name :**
TADEUSZ MAJEWSKI

ORIGINAL

**Notify Party**
GEODIS, THE NAVY YARD, 5101 S. BROAD
STREET, PHILADELPHIA, PA 19112-1404, ATTN: ANN TRAN,
EMAIL: ANN.TRAN@GEODIS.COM

**Notify Party 2 :**
THYSSENKRUPP MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI 48033, ATTN: TARA MONDRO, EMAIL:
TARA.MONDRO@THYSSENKRUPP-MATERIALS.COM'.

| **Vessel** | **Port of loading** |
|---|---|
| MV DRAWSKO | GEMLIK PORT,TURKEY |

**Port of discharge**
CHICAGO,IL, USA

| **DESCRIPTION OF GOODS** | | **Net Weight** | **Gross Weight** |
|---|---|---|---|
| PRIME COLD ROLLED STEEL IN COILS<br>THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505694HM | 8 COILS | 157,680 MT | 158,250 MT |

Freight payable as per charter party

THE VESSEL'S INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER: 9393450
COLOR MARK : BLUE-YELLOW

(of which                    on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsover arising)

| | |
|---|---|
| Freight payable as per<br>CHARTER-PARTY dated | SHIPPED at the port of loading in apparent good order and condition on board the vessel for carriage to the<br>port of discharge or so near thereto as she may safely get the       .. goods specified above. |
| FREIGHT ADVANCE.<br>Received on account of freight: | Weight, measure, quality, quantity, condition, contents and value       .. unknown<br>IN WITNESS where of the master or agent of the said vessel has signed   .  the numbers of Bills of Lading indicated below all of this tenor and date,<br>any one of which being accomplished the others shall be void. |
| Time used for loading            days            hours. | FOR CONDITONS OF CARRIAGE SEE OVERLEAF |

| Freight payable<br>as per charter party | Place and date of issue<br>GEMLIK, 25.03.2022 |
|---|---|
| Number of original Bs/L<br><br>3 / 3 | Signature<br><br>AS AGENT ON BEHALF OF THE CHARTERER PEGASUS DENIZCILIK A.S |

A&Z Shipping Agency
GEMLIK / TURKEY

**BILL OF LADING**

TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994
ADOPTED BY THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.

(a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

(b) Trades where Hague-Visby Rules apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

(c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder wil indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.



CODE NAME : "CONGENBILL". EDITION 1994

| Shipper | BILLS OF LADING | BL NO: PDEK2205GMCH0005 |
|---|---|---|

**Shipper**

BORCELIK CELIK SANAYII TICARET A.S.
MECLISI MEBUSAN CAD. 103
SALIPAZARI 34427, ISTANBUL, TURKEY

**BILLS OF LADING**
TO BE USED WITH CHARTER-PARTIES
Reference No. 12850

BL NO: PDEK2205GMCH0005

**Consignee**

TO THE ORDER OF THYSSENKRUPP
MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI, USA 48033

ORIGINAL

**Notify Party**

GEODIS, THE NAVY YARD, 5101 S. BROAD
STREET, PHILADELPHIA, PA 19112-1404, ATTN: ANN TRAN,
EMAIL: ANN.TRAN@GEODIS.COM

**Master Name :**
TADEUSZ MAJEWSKI

**Notify Party 2 :**

THYSSENKRUPP MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI 48033, ATTN: TARA MONDRO, EMAIL:
TARA.MONDRO@THYSSENKRUPP-MATERIALS.COM'.

| Vessel | Port of loading |
|---|---|
| MV DRAWSKO | GEMLIK PORT,TURKEY |

**Port of discharge**
CHICAGO,IL, USA

| DESCRIPTION OF GOODS | | Net Weight | Gross Weight |
|---|---|---|---|
| PRIME COLD ROLLED STEEL IN COILS<br>THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505697HM | 38 COILS | 326,310 MT | 328,665 MT |

Freight payable as per charter party

THE VESSEL'S INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER: 9393450
COLOR MARK : BLUE-ORANGE

(of which                                   on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsover arising)

| Freight payable as per CHARTER-PARTY dated | SHIPPED at the port of loading in apparent good order and condition on board the vessel for carriage to the |
|---|---|
| | port of discharge or so near thereto as she may safely get the .. goods specified above. |
| FREIGHT ADVANCE.<br>Received on account of freight: | Weight, measure, quality, quantity, condition, contents and value .. unknown |
| | IN WITNESS where of the master or agent of the said vessel has signed . the numbers of Bills of Lading indicated below all of this tenor and date, |
| | any one of which being accomplished the others shall be void. |
| Time used for loading ........... days ................. hours. | FOR CONDITONS OF CARRIAGE SEE OVERLEAF |

| Freight payable as per charter party | Place and date of issue<br>GEMLIK, 25.03.2022 |
|---|---|
| Number of original Bs/L<br>3 / 3 | Signature<br>AS AGENT ON BEHALF OF THE CHARTERER PEGASUS DENIZCILIK A.S<br><br>A&Z Shipping Agency<br>GEMLIK / TURKEY |

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994
ADOPTED BY THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.

(a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

(b) Trades where Hague-Visby Rules apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

(c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.



CODE NAME : "CONGENBILL". EDITION 1994

| | |
|---|---|
| **Shipper**<br><br>BORCELIK CELIK SANAYII TICARET A.S.<br>MECLISI MEBUSAN CAD. 103<br>SALIPAZARI 34427, ISTANBUL, TURKEY | **BILLS OF LADING**      BL NO: PDEK2205GMCH0010<br><br>TO BE USED WITH CHARTER-PARTIES<br>Reference No. 12881 |

**Consignee**

TO THE ORDER OF THYSSENKRUPP
MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI, USA 48033

**Notify Party**

GEODIS, THE NAVY YARD, 5101 S. BROAD
STREET, PHILADELPHIA, PA 19112-1404, ATTN: ANN TRAN,
EMAIL: ANN.TRAN@GEODIS.COM

**Master Name :**
TADEUSZ MAJEWSKI

**Notify Party 2 :**
THYSSENKRUPP MATERIALS TRADING NORTH AMERICA,
22355 WEST ELEVEN MILE ROAD,
SOUTHFIELD, MI 48033, ATTN: TARA MONDRO, EMAIL:
TARA.MONDRO@THYSSENKRUPP-MATERIALS.COM'.

| **Vessel** | **Port of loading** |
|---|---|
| MV DRAWSKO | GEMLIK PORT, TURKEY |

**Port of discharge**
CHICAGO,IL, USA

| DESCRIPTION OF GOODS | | Net Weight | Gross Weight |
|---|---|---|---|
| PRIME COLD ROLLED STEEL IN COILS<br>THYSSENKRUPP MATERIALS TRADING NORTH AMERICA P.O. NO.: 505751HM | 46 COILS | 610,370 MT | 613,810 MT |

Freight payable as per charter party

THE VESSEL'S INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER: 9393450
COLOR MARK : BLACK-GREY

| | |
|---|---|
| (of which      on deck at Shipper's risk; the Carrier not<br>being responsible for loss or damage howsover arising) | |
| Freight payable as per<br>CHARTER-PARTY dated<br><br>FREIGHT ADVANCE.<br>Received on account of freight:<br><br>.................................................................<br><br>Time used for loading     days     hours. | SHIPPED     at the port of loading in apparent good order and condition on board the vessel for carriage<br>                            to the<br>port of discharge or so near thereto as she may safely get the    .. goods specified above.<br><br>Weight, measure, quality, quantity, condition, contents and value    .. unknown<br><br>IN WITNESS where of the master or agent of the said vessel has signed   .   the numbers of Bills of Lading indicated below all of<br>this tenor and date,<br>any one of which being accomplished the others shall be void.<br><br>FOR CONDITONS OF CARRIAGE SEE OVERLEAF |
| | **Freight payable<br>as per charter party**     Place and date of issue<br>GEMLIK, 25.03.2022 |
| | **Number of original Bs/L**<br><br>3 / 3           Signature<br><br>AS AGENT ON BEHALF OF THE CHARTERER PEGASUS DENIZCILIK A.S<br><br>A&Z Shipping Agency<br>GEMLIK / TURKEY |

**BILL OF LADING**

TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994
ADOPTED BY THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.
 (a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

 (b) Trades where Hague-Visby Rules apply.
 In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

 (c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder wil indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight,
destination, etc., see overleaf.



# SUB-EXHIBIT C

**From:** Hasan CİÇİN <hasan@pegasus.com.tr>
**To:** Harold Kingsley <hmk@kingsleyandkingsley.com>
**Cc:** Caner BAL <cbal@pegasus.com.tr>, Mehmet INAL <minal@pegasus.com.tr>
**Date:** 02/01/2023 06:16 AM
**Subject:** RE: M/v Drawsko,Gemlik/Chicago Bs/l PDEK2205GMCH0002,3,4,5,10 dtd March 25, 2022; K&K TY-8429

Dear Mr. Kingsley,
Good day,

Pls find below recap of the fixture:

++++

MV DRAWSKO

for:
- account: borusan lojistik
- 1spb aa gemlik turkey marmara sea / 1spsb aa all /sorel or becancour or 3rivers + oshawa + hamilton + chicago + thunderbay)
- qty: abt 27000 mt steels crc / pipes
- part or sole cgo in owner's option.
- loading rate is 1750 shince eui pwwd
- nor to be tendered wwww atdnsshinc 12 hrs tt at gemlik
- discharge rate cqd
- frt usd (deleted) pmt fios lsd bss 1/5
- laycan vsl dates
- owners/master to give 72/48/24 hrs notices of vsl's arrival to load and discharge ports
- chrts free to use vessel cranes on board
- dunnage used to be in accordance with latest usa regulations owise any rejected infected dunnage all cost, time and consequences etc to be for charterers account
- time not to count before laycan/ time used before commencement of lay time not to count
- dem/det: usd (deleted) pdpr / fd at loadport only.
- fde upon shipment dnrsaoclonl
- frt payable over actual/real weight, 100 pct less w/i 5 bdays after completion of loading. Incase bs/l marked "freight prepaid", bs/l to be released after ows bankers confirmation that freight was irrevocably remitted
- not limited with but lack of stevedore / documentation / truck to be considered as detention
- cgo to be clean, dry and rust free. master has right to reject any damaged cgo and shipper to replace with soundones.
- if charterers fail to replace sound cargo; then all remarks to be inserted into bsl.
- vsl/holds is in full respect hv to be ready for loading of cargo, time lost for preparation to be fr ows acct;
- if org bills of lading not arrives to the dport in due time, owns will release cgo to receivers against p&i club wording loi which to be signed by chrts only
- master/owns to be responsible fm number of bundles/pieces loaded on board, not quality or weight of cgo.
- any shifting ordered by port authority/shipper/receivr/chrts at both ends to be receiver/shippers/chrts account. if shifting happens due to vessel/crew/owner failure then same to owner's time and account
- any taxes on ownership/vessel/Crew to be owner's account
- bimco isps clause to apply
- fixture is governed by english law, arbitration in london
- owise as per clean gencon 94 with logically amended recap of terms
- stem in order
- owise 3.75pct ttl com inc brokerage
END

Best regards,
Capt. Hasan CİÇİN
PEGASUS SHIPPING

# SUB-EXHIBIT D

## RE: Your reference: M/V Drawsko, Gemlik/Chicago Bs/L PDEK2205GMCH0002,3,4,5,10 dtd March 25, 2022

Paul J. Kozacky <pkozacky@kwmlawyers.com>

Tue 5/2/2023 11:10 AM

To:David Y. Loh <dloh@kmazuckert.com>
Cc:Harold Kingsley <hmk@kingsleyandkingsley.com>;Nicholas E. Pantelopoulos <nep@kmazuckert.com>

📎 1 attachments (284 KB)

2023-05-02 Charterparty (Redacted).pdf;

Good morning, David—

Attached is a copy of owner's charterparty with Pegasus (redacted of its sensitive financial terms). I particularly call to your attention to Clause 8 indicating that all matters pertaining to cargo lie with the charterer, and the provisions in Clause 70 that incorporate English law and require arbitration in London.

I am working with my clients on your request for security and will revert.

**Paul J. Kozacky**
Attorney at Law – Proctor in Admiralty



Kozacky Weitzel McGrath, P.C.
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
312.696.0900 (General Office)
312.907.0651 (Cell)
312.696.0901 (Direct Dial)
pkozacky@kwmlawyers.com
www.kwmlawyers.com



The World's Finest Law Firms

**From:** David Y. Loh <dloh@kmazuckert.com>
**Sent:** Tuesday, May 2, 2023 7:51 AM
**To:** Paul J. Kozacky <pkozacky@kwmlawyers.com>
**Cc:** Harold Kingsley <hmk@kingsleyandkingsley.com>; Nicholas E. Pantelopoulos <nep@kmazuckert.com>
**Subject:** RE: Your reference: M/V Drawsko, Gemlik/Chicago Bs/L PDEK2205GMCH0002,3,4,5,10 dtd March 25, 2022

Hi Paul:

Have Owners taken a formal position on security yet?

Also, may we get a courtesy copy of the involved charter party?

It's been a while since we spoke. . . .


David Y. Loh

KMA Zuckert LLC

1350 Broadway, Suite 2410

New York, NY 10018

+1 212.991.5914 Direct

+1 212.922.0450 Main

dloh@kmazuckert.com

www.kmazuckert.com



# Time Charter

**GOVERNMENT FORM**
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party** , made and concluded in ................................................*5th*................ day of ................*May*................ ~~19~~ *2021*

Between *Polsteam Shipping Company Ltd., Limassol, Cyprus*.................................................................

*disponent* Owners of the good ..*Bahamas flag*.. ~~Steamship~~/Motorship .......*TBA*....... - *See also Clause 29 for vessel's description* of .........................................

~~of .......................... tons gross register, and .......................... tons not register, having engines of .......................... indicated horse-power~~

and with hull, machinery and equipment in a thoroughly efficient state, and classed .........................*See Clause 29 (Vessel's Description Clause)*.........................

~~at .......................... of about .......................... cubic feet bale capacity, and about .......................... tons of 2240 lbs.~~

~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~~

~~allowing a minimum of fifty tons) on a draft of .......................... feet .......................... inches on .......................... Summer freeboard, inclusive of permanent bunkers,~~

~~which are of the capacity of about .......................... tons of fuel, and capable of steaming, fully laden, under good weather~~

~~conditions about .......................... knots on a consumption of about .......................... tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

now ............................................................................................*trading*..................................................................

......and . *Pegasus Denizcilik AS*.. Charterers of the City of *Kosuyolu Mah. Mahmut Yesari cad. No 72 Kosuyolu Kadikoy Istanbul, Turkey*
*P&I Club: Charterama*

**Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for ~~about~~ *one time charter trip/one laden leg via safe ports, safe berths, safe anchorages, in/out geographical rotation in Charterers' option, via Black Sea and Marmara Sea and enroute Mediterranean ports (Portugal/Spain/Greece/Italy) to Great Lakes, always afloat, no NAABSA allowed, always via ice free ports/places/approaches, with harmless, non-dangerous cargo, non IMSBC listed cargo of steel products. All cargoes to be loaded according to IMO and/or USCG rules and regulations. Duration about 35 days without guarantee*
.............................................................................within below mentioned trading limits.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party.

Vessel to be placed at the disposal of the Charterers, ~~at~~ *on passing Cape Passero eastbound, at any time, day or night, Sundays and holidays included* ..........................................................................................................................................

~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~ ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be ready to receive *the intended* cargo with clean-swept holds and tight, staunch, strong *(See also Clause 77)* and in every way fitted for the service, having water ballast, winches and donkey boiler with sufficient ~~steam~~ power, or if not equipped with donkey boiler, then other power sufficient to run all the ~~winches~~ *cranes* at one and the same time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, ~~including petroleum or its products, in proper containers, excluding~~ ..............................................................................
~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~ ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~ ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~ ~~Mexico, and/or South America~~ ........................................................................................................................ ~~and/or Europe~~ ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~ ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~ *Allowed for trading: Turkey, Gibraltar, Canada, USA and bunkering ports enroute and enroute Mediterranean ports (Portugal/Spain/Greece/Italy)* ............................................................................................................................................ ..........................................................................................................................................

as the Charterers or their Agents shall direct, on the following conditions:

1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; *and all other charges related to the Master, officers and crew* shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

2.   That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.~~

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

3.   ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~ ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than .......................... tons and not more than~~ ~~.......................... tons and to be re-delivered with not less than .......................... tons and not more than .......................... tons.~~ *See Clause 42.*

4. That the Charterers shall pay for the use and hire of the said Vessel at the rate ▮▮▮▮ *per day pro rata including overtime, basis MV Gardno type /* ▮▮▮▮ *including overtime basis MV Solina and MV Drawsko type* ▮▮▮▮ United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on~~ ▮▮▮▮ ~~summer freeboard, per Calendar Month,~~ commencing on and from the day *and time* of her delivery, as aforesaid, and at and after the same rate for any part of a *day* ~~month~~; hire to continue until the hour of the day *and time* of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping port pilot or if none, then on full away from port limits one safe port Hamilton (CA) - Kingston (CA) range, port in Charterers' option, at any time, day or night, Sundays and holidays included* ▮▮▮▮ unless otherwise mutually agreed. ~~Charterers are to give Owners not less than~~ *Charterers to give 10/7/5/4/3/2/1 day approximate notices of redelivery.* ~~days notice of vessels expected date of re-delivery, and probable port.~~ *See Clause 59. Acceptance of redelivery by Owners shall not constitute any waiver of Charterers' obligations.*

5. Payment of said hire to be made *into Owners' nominated bank account as per Clause 30, free of any Charterers' bank charges* ~~in New York~~ in cash in United States Currency, *20 days* ~~semi-monthly~~ in advance, and *thereafter every 5 days* ~~for the last half month~~ or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance *expected charter period* ~~day by day,~~ as it becomes due, if so required by Owners, ~~unless bank guarantee or deposit is made by the Charterers,~~ otherwise failing the punctual and regular payment of the hire, ~~or bank guarantee, or on any breach of this Charter Party,~~ the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *See also Clause 31.* Time to count *as* from *vessel's delivery.* ~~7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

~~Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.~~

6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *or safe anchorage* that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide. ~~, except at such places where it is customary for similar size vessels to safely lie aground.~~

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners~~ ▮▮▮▮ ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim *discharge, tally, lash, unlash, secure, unsecure, dunnage, undunnage* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's ~~or Tally Clerk's~~ receipts. *See Clause 65.*

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of ~~$1.00~~ *USD* ▮▮▮▮ per day. ~~Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.~~ *Charterers to pay a lumpsum of USD* ▮▮▮▮ *per month or pro rata for all victualling/gratuities and cost of cables.*

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel.

12. That the Captain shall use diligence in caring for the ventilation of the cargo.

13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ▮▮▮▮ ▮▮▮▮ ~~on giving written notice thereof to the Owners or their Agents~~ ▮▮▮▮ ~~days previous to the expiration of the first-named term, or any declared option.~~

~~14.~~ ~~That if required by Charterers, time not to commence before~~ *00:01 hours local time - 1st June 2021 (basis Passero)* ~~and should vessel~~ not have given written notice of readiness on or before *23:59 hours local time - 13th June 2021 (basis Passero)* ~~but not later than 4 p.m.~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the ~~day~~ *hour* of vessel's readiness. *Owners to narrow the laycan to 10 days spread 10 days prior 1st day of narrowed laycan.*

*If it become apparent that the vessel will miss her cancelling Owners are to immediately notify Charterers about situation arosen and Charterers to advise within 48 hours, Sundays and holidays excluded, whether they agree for new cancelling date or decide to cancel charter party and consider it as null and void.*

15. That in the event of the loss of time from deficiency *and/or default of men including of strike of officers and crew or deficiency* of ~~men or~~ stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, *unless resulting from inherent vice,* drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full *use of the vessel to the Charterers* ~~working of the vessel,~~ the payment of hire *and overtime* shall cease for the time thereby lost *and all direct extra expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account*; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17.   *See Clause 70 (Arbitration Clause).* ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

18.   That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hires* for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19.   That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of *latest* York-Antwerp Rules *and any amendments thereto.* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.~~

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.~~

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20.   Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

21.   ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

..............................................................................................................................................................................................

..............................................................................................................................................................................................

22.   Owners *are to provide* ~~shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also providing~~ ropes, *equipment,* falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide *free of expense sufficient electric lighting with vessel's light, light cluster as on board to permit work at all hatches,* ~~on the vessel lanterns and oil for night work, and vessel to give use of electric light when so fitted,~~ but any additional lights over those on board to be at Charterers' expense. The Charterers to have the use of any gear on board the vessel.

23.   Vessel to work night and day, *and on Sundays and on holidays* if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging; *See Clause 41.* ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches,~~ shore *cranemen* ~~Winchmen~~ to be paid by Charterers. ~~In the event of a disabled winch or winches, or insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned thereby.~~ *Charterers free to use vessel gears/cranes.*

24.   ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels; etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:~~

~~U. S. A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

~~Both to Blame Collision Clause~~

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. *Vessel never to force ice, nor to follow icebreakers.*

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, *her seaworthiness and maintenance, acts of pilots, tugboats and linesmen,* insurance, crew, and all other matters, same as when trading for their own account.

27. A commission of ▮▮▮▮▮▮▮▮▮▮ by the *Charterers* ~~Vessel and Owners~~ to ................................................*Clarksons Platou Hellas Ltd.* + ▮▮▮▮▮▮▮▮▮ *wanie payable by Owners*.......................................................... on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

28. An address commission of ▮▮▮▮▮▮▮ per cent payable to .......................*Charterers*....................... on the hire earned and paid under this Charter.

*Additional Clauses 29 to 104, both inclusive as attached are deemed to be fully incorporated in this Charter Party.*

**OWNERS**                                                                                              **CHARTERERS**

"This Charter Party is a computer generated copy of the NYPE46 form printed by authority of the Association of Ship Brokers & Agents (USA) Inc. (ASBA), using software which is the copyright of Maritech Limited. Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the pre-printed text of this document, and is not clearly visible, the provisions of the original ASBA-approved document shall apply. ASBA and Maritech Limited (collectively, "we") assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA-approved document and this document.

We provide you with access to the form on an 'as is' and 'as available' basis. We do not make any warranty or commitment that the form will operate free of errors, viruses or without interruption or meet your requirements. All warranties, conditions and other terms implied by statute or common law are excluded to the maximum extent permitted by applicable law. You assume sole risk and responsibility for the use of the form and for the results obtained and for conclusions drawn from using it. We will have no liability or responsibility for any loss, damage or cost (a) caused as a result of discrepancies between the original ASBA-approved document and this document, (b) caused by errors or omissions in any data, information, instructions or scripts, including any data you have entered in connection with the form, (c) in relation to the loss or destruction of or any damage to any such data, (d) caused by any actions we may take at your direction or (e) resulting from any decision you take in reliance on the form, including any legal, compliance and/or risk management decision. You acknowledge that by providing the form for use we are not providing legal, other professional or other advice. The foregoing does not affect our liability in respect of death or personal injury caused by negligence or that otherwise cannot be limited under law.

By accepting access to ASBA Charter Forms you agree to defend, indemnify and hold harmless ASBA, its affiliates, and their respective officers, directors, employees, agents, shareholders, partners, members, successors and assigns from and against any and all losses, liabilities, expenses (including reasonable attorneys' fees and costs), claims, suits, actions and damages arising from, or in connection with, (i) any third party claims or actions related to your use of the ASBA Charter Forms or ASBA trademarks, (ii) your violation of any applicable law or regulation in connection with the use of the ASBA Charter Forms or ASBA trademarks, other than that which you can demonstrate was pursuant to ASBA's instructions, (iii) your unauthorized use of any of the ASBA Charter Forms or ASBA trademarks (iv) gross negligence or wilful misconduct by you or any of your employees, contractors or agents, except to the extent directly or indirectly caused by any act or omission of ASBA."

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

### Clause 29 - Vessel's Description

MV GARDNO TYPE
MV GARDNO
GENERAL CARGO, SD, ENGINE AFT,
BAHAMA FLAG, PORT OF REGISTRY: NASSAU
IMO 9767704, BLT 2018
36,643 T DWT ON 11.25 SSW
TPC 42.3
LOA:199.919 M/ BEAM 23.70 M
MOULDED DEPTH 15.30 M
GT:22982 T/ NT:12731 T
GEARS 3 X SWL 36 MT (WITH NO GRAB) AND 3 X SWL 26 T (WITH GRAB)
6 HO / 6 HA
TOTAL CAPACITY 1'506,961 CBFT

BREAKDOWN BY HOLDS GRAIN(M3)
H1 5485.255
H2 8775.871
H3 8605.264
H4 5971.286
H5 8125.902
H6 5708.398
TTL 42,671.98 M3

HOLDS (TANK TOP):
HO1 L/B/D [M] 19.2 (TANK TOP :19.2)/12.6 FORE PART (TANK TOP)20...7 AFT PART (TANK TOP), 15.405
HO2 L/B/D [M] 28.8/21.5/15.004
HO3 L/B/D [M] 28.8/21.5/14.542
HO4 L/B/D [M] 20.0/21.5/14.27
HO5 L/B/D [M] 27.2/21.5/14.27
HO6 L/B/D [M] 20.8/21.5-FORE PART 9.2-AFT PART (TANK TOP)/14.27

HATCHES: L/B/D[M]
1 :14.4X15.6
2 :20.8X17.6
3 :20.8X17.6
4 :12.8X17.6
5 :20.8X17.6
6 :14.4X17.6

MAX TANK TOP STRENGTH AND TANK TOP DIMENSION
CARGO HOLD NO. 1 2 3 4 5 6 LOAD(T/M2)
CARGO HOLD BOTTOM: 20 T/M2 LOCAL LOAD.
MAX CARGO MASS(T) RELAY ON THE LOADING COMPUTER.
AREA OF TANK TOP(M2) 318.7 619.0 619.0 447.0 584.0 319.0.
MAX CAPACITY OF BUNKER TANKS: 1311.0 M3 IFO/ 550.0 MT MGO LS
FRESH WATER TANKS: 278 M3.
CLASSED LR
PANDI COVERED
SPEED/CONSUMPTION (IN GOOD WEATHER CONDS, NO NEGATIVE INFLUENCE OF SWELL, NO ADVERSE CURRENT, WITH MAXIMUM BEAUFORT SCALE 4 AND/OR DOUGLAS SEA STATE 3, SHOULD WEATHER CONDITIONS EXCEED ABOVE DESCRIBED LIMITS, CHRTRS ARE BARRED FROM LODGING UNDERPERFORMANCE CLAIM):
BALLAST 13.5 KN ON 20.0 MT IFO
LOADED 13.5 KN ON 22.0 MT IFO

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

ECO SPEED/CONSUMPTION WOG:
BALLAST 12.0 KN ON 16.0 MT IFO
LOADED 12.0 KN ON 18.5 MT IFO

PORT (INCLUDING BALLAST OPERATION):
2.5 MT IFO/ 0.1 MT MGO IDLE
3.5 MT IFO/ 0.1 MT MGO 1 CRANE WORKING
4.5 MT IFO/ 0.1 MT MGO 2 CRANES WORKING
5.5 MT IFO/ 0.1 MT MGO 3 CRANES WORKING

EU PORTS (INCLUDING BALLAST OPERATION) :
0.0 MT IFO/ 2.5 MT MGO IDLE
0.0 MT IFO/ 3.5 MT MGO 1 CRANE WORKING
0.0 MT IFO/ 4.5 MT MGO 2 CRANES WORKING
0.0 MT IFO/ 5.5 MT MGO 3 CRANES WORKING

VSL MAY BURN MGO LS WHEN MANOUVERING IN NARROW WATERS/PORTS/CANALS AND IN TROPICAL WATERS.

AS FROM 1ST JAN 2015 ACCORDING TO MARPOL ANNEX VI REGULATIONS IN EU PORTS/SECA/ECA VSL IS OBLIGED TO CONSUME FUELS WITH MAX SULPHUR CONTENT MAX 0.1 % (MGO 0.1).

ALSO AS FROM 1ST JAN 2020 ACCORDING TO IMO REGULATION FOLLOWED BY MARPOL ANNEX VI, OUTSIDE EU PORTS/SECA/ECA VSL IS OBLIGED TO CONSUME FUELS WITH MAX 0.5 PCT (VLSFO MAX 0,5%S).

ALL DETAILS ABOUT

OR IN OWNERS OPTION MV SOLINA TYPE
MV SOLINA
M/V 'SOLINA'
GEARED, SD, BC, BUILT 2012
BAHAMAS FLAG
IMO 9496252
30182 DWT ON 10.216 M SSW
LOA: 189.595M/ BEAM: 23.61M
MOULDED DEPTH: 14.603M
GRT/NRT: 20603 / 9291
GEAR 3 X SWL 30 MT
6 HO / 6 HA
HOLDS CUBIC CAPACITY: 1'317 029 CBFT

HOLD GRAIN(M3) BALE(M3)
H1 4988.18 4878.44
H2 7084.29 6928.44
H3 6238.64 6101.39
H4 6317.60 6178.61
H5 7071.23 6915.66
H6 5594.04 5470.97
TTL 37293.98 36473.51

CLASS DNV / PANDI COVERED

SPEED/CONSUMPTION (IN GOOD WEATHER CONDS, NO NEGATIVE INFLUENCE OF SWELL, NO ADVERSE CURRENT, WITH MAXIMUM BEAUFORT SCALE 4 AND/OR DOUGLAS SEA STATE 3, SHOULD WEATHER CONDITIONS EXCEED ABOVE DESCRIBED LIMITS, CHRTRS ARE BARRED FROM LODGING UNDERPERFORMANCE CLAIM):

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

BALLAST 13.5 KN ON 24.0 MT IFO
LOADED 13.0 KN ON 25.0 MT IFO

ECO SPEED/CONSUMPTION WOG:
BALLAST 12.0 KN ON 20.0 MT IFO
LOADED 11.5 KN ON 21.0 MT IFO

PORT:
3,0 MT IFO/ IDLE
4,0 MT IFO/ 2 CRANES WORKING
5,0 MT IFO/ 3 CRANES WORKING

EU PORTS:
3,0 MT MGO/ IDLE
4,0 MT MGO/ 2 CRANES WORKING
5,0 MT MGO/ 3 CRANES WORKING

BUNKER QUALITY/SPECS:
GRADES AS PER ISO 8217: 2010
IFO 380 CST RMG 380
MGO DMA
SULPHUR CONTENT AS PER STATUTORY REQUIREMENTS

ALL DETAILS ABOUT

OR IN OWNERS OPTION MV DRAWSKO TYPE
MV DRAWSKO
GEARED, SD, BC, BLT 2010
BAHAMA FLAG, PORT OF REGISTRY: NASSAU
IMO 9393450
30487 DWT ON 10.22 SSW
LOA: 189.9M/ BEAM: 23.59M
MOULDED DEPTH: 14,59M
GT: 20603/ NT: 9930
GEAR: 3 CR X SWL 30 MT
6 HO / 6 HA
TOTAL CAPACITY 1,373,059 CBFT

BREAKDOWN BY HOLDS
GRAIN(M3)
H1 4988.18
H2 7084.29
H3 7071.22
H4 7071.73
H5 7071.23
H6 5594.04
TTL 38880.69

CLASSED DNV
PANDI COVERED
SPEED/CONSUMPTION (IN GOOD WEATHER CONDS, NO STRONG ADVERSE CURRENT, WITH MAXIMUM BEAUFORT SCALE 4 AND/OR DOUGLAS SEA STATE 3, SHOULD WEATHER CONDITIONS EXCEED ABOVE DESCRIBED LIMITS, CHRTRS ARE BARRED FROM LODGING UNDERPERFORMANCE CLAIM):
BALLAST 13.5 KN ON 24.0 MT IFO
LOADED 13.0 KN ON 25.0 MT IFO

WORKING COPY

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

ECO SPEED/CONSUMPTION:
BALLAST 12.0 KN ON 20.0 MT IFO
LOADED 11.5 KN ON 21.0 MT IFO

PORT:
3,0 MT IFO/ IDLE
4,0 MT IFO/ 2 CRANES WORKING
5,0 MT IFO/ 3 CRANES WORKING

EU PORTS:
3,0 MT MGO/ IDLE
4,0 MT MGO/ 2 CRANES WORKING
5,0 MT MGO/ 3 CRANES WORKING

BUNKER QUALITY/SPECS:
GRADES AS PER ISO 8217: 2010
IFO 380 CST RMG 380
MGO DMA
SULPHUR CONTENT AS PER STATUTORY REQUIREMENTS
AS FROM 1ST JAN 2015 ACC TO MARPOL ANNEX VI REGULATIONS IN SECA/ECA ZONES
VSL IS OBLIGED TO CONSUME FUELS WITH MAX SULPHUR CONTENT 0.1 (MGO 0.1)
INSTEAD OF IFO LS
ALL DETAILS ABOUT

+++

- OWN CONFIRMS THAT PERFORMER VESSEL(S) TO BE FITTED FOR GREAT LAKES, CANADA

- DECLARATION OF DEF PERFORMER TO BE GIVEN UPON NARROWING LAYCAN

FULL OWNERSHIP CHAIN:

OWNERS FULL STYLE:
1.REGISTERED OWNERS:
MV DRAWSKO: ERATO TWO SHIPPING LIMITED
MAREVA HOUSE, 4 GEORGE STREET
NASSAU, COMMONWELTH OF BAHAMAS

MV SOLINA: ERATO SEVEN SHIPPING LIMITED
MAREVA HOUSE, 4 GEORGE STREET
NASSAU, COMMONWELTH OF BAHAMAS

MV GARDNO: KLIO ONE MARITIME LIMITED
MAREVA HOUSE, 4 GEORGE STREET
NASSAU COMMONWELTH OF BAHAMAS

2.DISPONENT OWNERS (ON ALL VESSELS):
POLSTEAM SHIPPING COMPANY LTD.
17, GR. XENOPOULOU STR., TOTALSERVE HOUSE
3106 LIMASSOL, CYPRUS
VAT NO.: CY 10140646A

3. MANAGING OWNERS (ON ALL VESELS):
POLSKA EGLUGA MORSKA P.P., SZCZECIN

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

+++

VESSEL'S DWAT
OWNERS/MASTER CONFIRM THAT DWAT ON 8M FW IS ABT:
21,500 MT BSS MV GARDNO TYPE
20,200 MT BSS MV SOLINA TYPE
20, 450 MT BSS MV DRAWSKO TYPE
FROM ABOVE YOU HAVE TO DEDUCT ROUGHLY ABT 600-650 MT FOR CONSTANTS/VARIOUS PLUS ADDITIONALLY ALSO FOR BUNKERS ACCORDINGLY.

+++

OWNERS GUARANTEES
- OWNS WARRANT THAT THE VESSEL HAS A NATURAL HOLD VENTILATION SYSTEM AND IT IS IN GOOD WORKING CONDITION.

- VESSEL SHALL NOT CHANGE OWNERSHIP OR CLASS OR FLAG WITHOUT CHARTERERS' WRITTEN CONSENT.

- VESSEL DID NOT CALL ANY ISRAELI PORTS, FOR THE LAST 24 MONTHS, AND OWNS/MANAGEMENT/CERTIFICATES HAVE NO CONNECTION WITH ISRAEL.

- OWNS CONFIRM THAT HOLDS/HATCHES ARE UNOBSTRACTED AND VESSEL HAS NO STANCHIONS.

- OWNER CONFIRM THAT VESSEL'S RELATIONSHIP WITH CYPRUS, INCLUDING BEING DISPONENT OWNER, EXCEPT TECHNICAL MANAGEMENT, NOT TO BE SHOWN ANY VESSEL'S CERTIFICATES, DOCUMENTS, AGREEMENTS, EXCEPT FOR CREW EMPLOYMENT CONTRACTS WHICH ARE NOT PRESENTED TO PORT AUTHORITIES ANYWAY. IF VESSEL'S ANY RELATIONSHIP WITH CYPRUS, ON THE CERTIFICATES, OLD RECORDS, DOCUMENTS ARISEN BY TURKISH AUTHORITIES, TIME, RISK, COST AND EXPENSES TO BE ON OWNER'S ACCOUNT. THIS IS BEYOND CHARTERER'S CONTROL AND CHARTERERS CAN NOT KNOW IF ANY DOCUMENT CONTAINS DISPONENT OWNER ON CERTIFICATES OR CAN NOT CONTROL CREW/MASTER FAILURE TOO.

- OWNS WILL COMPLY WITH ALL RULES AND REGULATIONS OF THE PORT, LOCALITY AND COUNTRY OF LOAD AND DISCHARGE PORTS.

- HEAD OWNERS, DISPONENT OWNERS AND MANAGERS REMAIN JOINTLY AND SEVERALLY RESPONSIBLE FOR THE DUE FULFILLMENT OF THIS CONTRACT.

- OWNS CONFIRM VESSEL CAN FOLLOW MARPOL/EU LEGISLATION PERTAINING TO FUEL SULPHUR CONTENT THROUGHOUT THIS CHARTER PARTY.

- OWNS GTEE VSL IS GEARED ST SDBC SUITABLE FOR GRAB DISCH.

- VSL'S GEAR, IF ANY, ARE IN FULL WORKING CONDITION AND TO BE SO MAINTAINED AND AT CHRTS FREE DISPOSAL FOR THE ENTIRE DURATION OF CP.

- OWS GTEE THAT VSL IS CLASSED HIGHEST LLOYDS OR EQUIV AND MEMBER OF IACS AND OWNERS SHALL EXERCISE CONTINUING DUE DILIGENCE TO REMAIN VALID FOR THE WHOLE DURATION OF THIS CP.

- OWS GTEE THAT VSL IS FULLY P+I COVERED BY A MEMBER OF THE INT GROUP CLUBS AND OWNERS SHALL EXERCISE CONTINUING DUE DILIGENCE TO REMAIN VALID FOR THE WHOLE DURATION OF THIS CP.

- OWNS GTEE THAT VSL IS ITF FITTED AND CERTIFICATE OF FINANCAL RESPONSIBILITY IS IN FULL COMPLIANCE.

- OWNS GTEE THAT VSL IS AND WILL REMAIN FOR THE WHOLE DURATION OF THIS CP FULLY H+M INSURED:

---

CP ID: 37471      CP Date: 05 May 2021      Page 9 of 27

**ADDITIONAL CLAUSES TO TBA**
**CHARTER PARTY DATED 5TH MAY 2021**

H+M VALUE AND INSURER:WARTA / PZU, VALUE:
MV GARDNO: USD 26 875 000
MV SOLINA: USD 13 750 000
MV DRAWSKO: USD 12 500 000

- OWNS GTEE VSL FULLY ISM COMPLIANT.

- BIMCO STANDARD ISM/ISPS CL TO APPLY.

- OWNS WARRANT THAT THE VSL HAS NO OUTSTANDING PSC DEFICIENCIES AT TIME OF THIS FIXTURE.

- OWNS GTEE THAT VSL WILL COMPLY THROUGHT THE FIXTURE WITH ALL RELEVANT PORT AND CANAL REGULATIONS.

- OWNS GTEE THAT ALL CERTIFICATES OF THE VESSEL ARE AND WILL REMAIN VALID THROUGHOUT THE WHOLE DURATION OF THIS CHARTER PARTY.

- OWNS TO ADVISE VSLS ITINERARY:
OWS TO ADVISE ALONG WITH VSLS NOMINATION.

- SEAWAY TOLLS UPBOUND (ESCOUMINS / QUEBEC / MONTREAL / ST LAMBERT / SNELL / CAPT VINCENT / TORONTO) TO BE CHRTS ACCOUNT. VSL WILL BE REDELIVERED UPON DEPARTURE FM SOREL OR TORONTO PORTS. SEAWAY TOLLS DOWNBOUND TO BE OWNERS ACCOUNT.

- CHRTS TO USE OWNER'S MARINE CARRIER BOND AND BILL OF LADING NUMBERS FOR CANADA CARGO/BILLS.

LAST 5 CARGOES / CHARTERERS (LATEST TO BE FIRST)
OWS TO ADVISE ALONG WITH VSLS NOMINATION.

## Clause 30

First hire to be paid to Owners within 3 banking days upon delivery for 20 days in advance and thereafter every 5 days.

In order to avoid problems with transfer of hire to PSC, Limassol account Owners to nominate bank account of their affiliate Polsteam USA, New York within Polsteam Group:

BENEFICIARY: POLSTEAM USA INC
JP MORGAN CHASE BANK
3 TIMES SQUARE, NEW YORK, NY 10036
FED(ABA) NO:021000021, CHIPS 0002
ACCOUNT: 816347256
SWIFT: CHASUS33

and Charterers to provide swift copy same on Owners' request.

## Clause 31

Referring to lines 60 and 61, where there is any failure to make "punctual and regular payment" due to oversight or negligence or error or omission of Charterers' employees, bankers or Agents, Owners shall notify Charterers in writing whereupon Charterers will have three banking days to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

### Clause 32

Charterers to have the right to withhold from charter hire during the period of this charter such amounts due to undisputed off-hire.

However, final accounting to be arranged by Charterers as prompt as possible.

### Clause 33

In the event of the vessel being boycotted by I.T.F. delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to vessel's flag, Ownership, crew, terms of employment of Officers or crew or any other vessel under the same Ownership, operation or control, all time lost is to be considered as off-hire and any direct expenses incurred thereby to be for Owners' account.

### Clause 34

Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra direct expenses shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their Agents or their employees, or by reason of cargo carried.

In the event of arrest/detention or other sanction against the vessel before loading through no fault of Charterer which prevents Owners from performing the present Charter Party, Charterers are entitled to terminate the charter if the arrest/detention exceeds 2 consecutive days.

### Clause 35

Any delay, expenses and/or fines incurred on account of smuggling to be for Owners' account unless caused by Charterers and/or their Agents and/or their employees.

### Clause 36

Charterers to have the option to add any off-hire time to the charter period.

### Clause 37

Any delay, direct expense by reason of non-compliance with regulations, lack of proper documentation or equipment as per Clause 29 and 45 to 49 or on any breach of said Clauses to be for Owners' account.

### Clause 38

If Stevedores, longshoremen or other workmen are not permitted to work due to failure of the Owners to comply with Clause 49 or because of lack of said certificates, any time so lost shall be treated as off-hire, and all extra expenses incurred, directly resulting from such failure shall be for Owners' account.

### Clause 39

Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed there from. All fuel used by the vessel while off-hire shall be for Owners' account.

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

### Clause 40

If for any reason whatsoever the vessel will be off-hire or is reasonably estimated to be off-hire for 30 (thirty) days, Charterers have the option to cancel the balance of this Charter Party, if the vessel is cargo free.

### Clause 41

At or off loading and/or discharging ports crew to open and close the hatches, if when and where required if permitted by local regulations weather/sea state permitting otherwise for Charterers' account. Charterers or their Agents to apply and Master to follow instructions given in this respect.
Stevedore standby expenses due to late opening of hatches by fault of crew to be for Owners' account. During such period vessel is considered off-hire pro rata with number of hatches workable.

-Crew's overtime to include the following services:
-Deleted
-Deleted
-Supervision of loading and/or discharging operations.
-Maintaining necessary power and light while loading and/or discharging.
-Wharping ship when and where required.
-Docking and undocking.
-Bunkering
-Deleted
-Deleted
-Opening and closing of hatches.
-If required by the Charterers the Master to take maximum ballast to keep freeboard lowest possible to facilitate cargo handling operations provided trim permits.

### Clause 42

Bunker quantities on delivery / bunker prices:
Owners to provide along with vessel's nomination.

Charterers will replenish bunkers and redeliver the vessel with about same bunker quantities on delivery.

Charterers will not pay for bunkers on board on delivery. Instead of bunker payment Charterers to pay 20 days advance together with first hire.

Any differences on bunker figures to be settled along with final hire statement.

Bunker prices for adjusting minor differences (as per above description) in quantity on redelivery to be based on average Montreal delivered price (not ex-wharf price) on the day of redelivery, as per Platts bunker wire quotation.

In case ISO 8217/2010 specs are not available, then Charterers have the right to replenish ISO 8217/2005 specs.

### Clause 43

Owners have right to bunker for their own account provided same not to interfere with Charterers' operation or intake.

### Clause 44

Deleted.

**<u>ADDITIONAL CLAUSES TO TBA</u>**
**<u>CHARTER PARTY DATED 5TH MAY 2021</u>**

### <u>Clause 45</u>

The Owners are to provide and keep on board valid Deratization Certificate throughout the Charter period. Deratization shall always be for Owners' account.

### <u>Clause 46</u>

Through the period of the Charter, vessel to be in possession of all necessary valid equipment and certificates to comply with safety and health regulations, and all current requirements at all ports of call including Panama Canal.

### <u>Clause 47</u>

For the carriage of grain in bulk, vessel to have on board throughout this Charter period valid documents and certificates issued by the classification society and/or national authority and accepted by N.C.B. Ministry of Transport on the basis of the SOLAS 1974 regulations and latest amendments thereto.

### <u>Clause 48</u>

Vessel to be fit for grab discharge and no cargo to be loaded in places inaccessible to grabs or deeptanks.
Charterers to have the privilege of using bulldozers in vessel's holds.
However, unit weight of bulldozers will not exceed vessel's tanktop strength and to have rubber wheels.

### <u>Clause 49</u>

The Owners undertake that all equipment shall conform to regulations in all ports visited by the vessel and that the vessel is at all time in possession of valid certificates to comply with such regulations.

### <u>Clause 50</u>

Deleted.

### <u>Clause 51 - Insurance Clause</u>

Owners shall maintain and carry on board a valid P. & I. Entry Certificate containing the oil pollution limitation of cover clause.

Owners, by production of a Certificate of Insurance or otherwise, shall satisfy the requirements of (a) Section 311 (p) of the United States Federal Pollution Control Act, as amended through 1978 (33 US Code Section 1321 (p), (b) Articles VII of the International Convention of Civil Liability for Oil Pollution Damage 1969 as far as applicable, (c) a valid and up-to-date certificate for Financial Responsibility as required under the Oil Pollution Act 1990.

Owners to remain responsible for all consequences that may occur including extra direct expenses and/or off-hire periods for the vessel as a result of not having such valid and up-to-date certificate on board at all times during the currency of this Charter.

### <u>Clause 52</u>

Deleted.

### <u>Clause 53</u>

Owners/vessel are free of extra insurance due to vessel's age/flag/ownership.
Any extra war risk insurance premium for calling at any war/warlike zones including but not limited to Israel, to be for

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

Charterers' account.

### Clause 54

In the event of outbreak of war between any of the following countries: United States of America, the country of vessel's flag, C.I.S., Communist China, United Kingdom, Japan, Greece, France, Germany, both, Charterers and Owners, have the option of cancelling this Charter Party.

It is understood that war means direct war between these nations and does not include local hostilities or civil war where any of the above countries support opposing sides. Owners shall not unreasonably take advantage of this Clause in case of a limited local conflict.

### Clause 55

The Basic Annual War Risks Insurance Premium on the vessel's hull and machinery value and present war bonus to the Master, Officers and crew are for Owners' account, but any increase of same due to vessel's trading into an excluded are to be for Charterers' account.

### Clause 56 - Bills Of Lading/Cargo Claim

This Charter is subject to the New Jason Clause, New Both-to-Blame Collision Clause and "Conwartime 2004" as attached, which are to be incorporated in all Bills of Lading issued under this Charter.

All Bills of Lading issued under this Charter will incorporate the General Paramount Clause as attached.

Charterers and/or their agents and/or their nominee are hereby authorized to issue and sign Bills of Lading as presented to Owners/master's behalf, in strict conformity with mate's receipt(s).

No waybill. Liner, through Bills of Lading to be issued.

### Clause 57 - Trading Exclusions

Allowed for trading: Turkey, Gibraltar, Canada, USA and bunkering ports enroute and enroute Mediterranean ports (Portugal/Spain/Greece/Italy).
All other countries, war, warlike zones are excluded.

Charterers have the option to call Oran, Algeria to load cargo of steel billets only.

If on vessel's sea passage to St. Lawrence it becomes obvious, that the vessel view to ice condition is not able safely arrive St. Lawrence/Great Lakes system and ports within, it is in Master's option to wait for weather/ice situation improvement, however the decision to be always in Master's/Owners' discretion and vessel to remain on hire during all waiting time for weather/ice situation improvement. Employment of an ice advisor is always on Charterers' account.
In any case the vessels not to force ice but to follow ice breakers free of charge to Owners.

### Clause 58 - Cargo Exclusions

Cargo exclusions: allowed for loading rebar/debar/wire rods in coils/merchant bars/billet/profiles).
In case Charterers need any other type of cargo will check with Owner case by case.

Hot rolled coils in bulk are allowed. For loading hot rolled coils the Owners to arrange precondition survey, cost to be split equally between the Owners and the Charterers. The results of said survey to be inserted on mate's receipts and Bills of Lading respectively.

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

Cargo Intake

Owners confirm the vessel is able to load steels including coils up to vessel's maximum tanktop strength and always subject to vessel's physical, stability, class and strength limitations. If steel coils loaded, Owners will allow Charterers to load steel coils in as many tiers as possible but always limited for the sake of safety of cargo condition and avoidance of any possible cargo damage as well as safety and tanktop strength on adequate dunnage to spread the tanktop load, upto vessel's permitted capacity and always subject to master's supervision and agreement which not to be unreasonably withheld. Maximum allowable tanktop strength may never be exceeded as per loading booklet.

No welding fixtures to be done on the vessel whatsoever.

.

## Clause 59 - Redelivery Clause

Charterers to give Owners the following notices:
10/7/5/4/3/2/1 day approximate notices of redelivery.

## Clause 60 - Stevedore Clause

Charterers will not be held responsible for damages to the vessel unless notified in writing by the Master at the time of occurrence of damage or latest prior sailing port damage occurred.
Master to co-operate with Charterers and Agents in giving prompt notice of claim in writing to party causing same latest before sailing.

Upon each occurrence of serious damage Master to immediately inform Charterers by telex stating exact description and exact extent of such damage and provided that it is practical a joint survey to be held, the expenses of which to be shared 50/50 between Charterers and Owners. Master to use his best efforts to obtain written acknowledgement by responsible parties causing damages unless damage be made good in the meantime by Stevedores otherwise Charterers are not held responsible.

Hidden damages to be notified immediately upon discovery but in any case not later than on completion of the voyage.

Damages affecting vessel's class or seaworthiness or trading abilities to be repaired by Charterers at their time and expense as soon as occurred or in any case prior to redelivery. Other minor damages to be listed in the off-hire survey report and Owners to be compensated on the basis of an estimate of the cost of repairs by the off-hire surveyor.

## Clause 61

Negotiations and the fixture to be kept strictly private and confidential.

Any negotiations, whether leading to a fixture or not, to be totally private and confidential and not to be disclosed to third parties.

## Clause 62 - Ballasting Clause

Charterers have the right to instruct Master to utilise the vessel's maximum water ballast capacity in order to bring down vessel's height to get into position under loading and/or discharging appliances, however, always in conformity to free board and/or safety requirements.

## Clause 63 - Agency Clause

Charterers agree to have their Agents attend to normal ship's husbandry as Owners' Agents without extra agency fee. Except

**ADDITIONAL CLAUSES TO TBA
CHARTER PARTY DATED 5TH MAY 2021**

in case of any extraordinary services such as crew member desertion or hospitalization general average, major repairs and other similar major items. In such cases Owners shall appoint their own Agents or pay Charterers' Agents the relevant agency fee.

### Clause 64
Local time to apply for delivery time and hire calculations to be in GMT.

### Clause 65
Charterers to have the right to use their own Bills of Lading with reference to line 78/79 of the Charter Party.

Charterers and/or their agents and/or their nominee are hereby authorized to issue and sign Bills of Lading as presented to Owners/master's behalf, in strict conformity with mate's receipt(s), without prejudice to this Charter Party.

Cargo remarks on Mate's Receipts to be qualified and quantified. Remarks like "all" or "some" or in percentages etc. are not to be allowed. Master to advise intended remarks as the daily tally figures are presented and Supercargo, if attending, to be kept informed prior to remarks being recorded.

Charterers to indemnify Owners for any differences in the remarks between Bills of Lading and Mate's Receipts. Charterers to submit full details of cargoes booked prior to loading at each port.

No waybills/liner Bills of Lading/ through Bills of Lading to be issued under this Charter Party.

Charterers may load/discharge cargo under light rain condition and relevant remarks will be inserted into cargo documents. In this case, Charterers undertake to hold Owners and their servants harmless and to negotiate and settle directly all claims for cargo damages resulting from ordering the vessel to load/discharge cargo at loading/discharging port during rain condition. Meantime Charterers and receivers to issue and sign respective Letter of Indemnity as per Owners' wording.

### Clause 66
The Charterers have the privilege to double bank the vessel, i.e. may order the vessel alongside any other vessel and vice versa. However, all additional costs/arrangements (including arrange fenders to put between vessels)/ time/responsibility arising from this double bank operation to be for Charterers' account and Charterers to provide other vessel's Masters' prior written approval. Charterers also to reimburse any additional premium payable by Owners to cover such operation(s) under their hull and machinery and loss of hire insurance. Double banking operation should be carried out provided weather permitting and Master will have discretion to stop the same if he feels unsafe to continue same.

### Clause 67
Charterers to appoint an independent surveyor which to be approved by Owners on their behalf for performing a joint on- and off-hire bunker and condition survey. Joint on-hire survey to be in Charterers' time and joint off-hire survey to be held in Owners' time but only if the off-hire survey interferes with Charterers' operation. Expenses to be shared equally.
On/off hire bunker and condition survey to be 50/50 between Owners and Charterers.

### Clause 68 - In Lieu Of Hold Cleaning
Vessel has no lashing materials on board and Charterers to arrange for such materials as much as necessary in reasonable basis for the lashing of steel cargo at Charterers' time and cost and same to be removed to the master's satisfaction upon completion of discharge of steel cargo cost and time of removal to be for Charterers' account.

All dunnage to be provided and removed at Charterers' time and cost and same to be accompanied by relevant phytosanitary

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

certificate.

Chocking/lashing/securing to be to master's/P&I surveyor's satisfaction which not to be unreasonably with-held for both parties.

Charterers have the option to redeliver the vessel with unclean holds against a lumpsum payment of USD 5,000 in lieu of hold cleaning, excluding dunnage/lashing material/debris removal and disposal.

### Clause 69
Any taxes and/or dues on the vessel, due to crew shall be for Owners' account. Any taxes and dues on cargo or freight or Charter hire to be for Charterers' account.

### Clause 70 - BIMCO Standard Dispute Resolution Clause 2016 - English Law, London Arbitration
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A Party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other Party requiring the other Party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other Party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other Party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the Party referring a dispute to arbitration may, without the requirement of any further prior notice to the other Party, appoint its arbitrator as sole arbitrator and shall advise the other Party accordingly. The award of the sole arbitrator shall be binding on both Parties as if the arbitrator had been appointed by agreement.

Nothing herein shall prevent the Parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the Parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract. In the case of any dispute in respect of which arbitration has been commenced under the above, the following shall apply:

(i) Either Party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other Party of a written notice (the "Mediation Notice") calling on the other Party to agree to mediation.

(ii) The other Party shall thereupon within fourteen (14) calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the Parties shall thereafter agree a mediator within a further fourteen (14) calendar days, failing which on the application of either Party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the Parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other Party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the Parties.

**ADDITIONAL CLAUSES TO TBA**
**CHARTER PARTY DATED 5TH MAY 2021**

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either Party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each Party shall bear its own costs incurred in the mediation and the Parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

(Note: The Parties should be aware that the mediation process may not necessarily interrupt time limits.)

General average to be settled in London as per latest York-Antwerp rules.

### Clause 71

Gangway watchmen always to be for the account of the party appointing same unless compulsory in which case they are to be for Charterers' account.
In case gangway watchmen is ordered due to crew/vessel/master then same to be Owners account.

### Clause 72

Owners to confirm that vessel has not been detained by any ECC countries during the last 24 months and has no outstanding deficiencies from port state controls. Otherwise please advise where and for what reason.

### Clause 73

The Charterers shall have the option to superficially inspect the vessel at any time during the period of the Charter Party and the Master/Officers and crew to render all necessary co-operation.

### Clause 74

Charterers warrant that the vessel shall be entered with a Protection and Indemnity Club for full P & I cover and fully insured for Hull and Machinery damages and that such cover will be in place as from vessel's delivery into Charterers' service for the duration of this Charter Party. Owners to advice full contact details of their P&I Club and Hull Underwriters and to provide Owners with valid copies of the relevant cover notes.

### Clause 75

Owners to give first notice of delivery upon clean fixing followed by daily notices.

### Clause 76

Owners to guarantee that the vessel has not traded to/from any C.I.S./ex U.S.S.R. Pacific ports within the last 24 months.

Furthermore, Owners to guarantee that the vessel on delivery meets all Agricultural Canada Plant Protection Division and U.S.D.A. Plant Protection and Quarantine Office Regulations concerning the Asian Gypsy Moth.

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

Furthermore, Owners guarantee that the vessel is free of any Asian Gypsy Moth eggs or larvae or any form of Asian Gypsy Moth life. Should the vessel be found to have same, vessel to be considered off-hire until the vessel has been passed/cleared by Canadian/U.S. authorities. All costs, consequences, losses, damages including but not limited to loss of sale/purchase to be for Owners' account.

### Clause 77 - Hold Condition

On delivery, vessel's holds to be washed down by water, cleaned, dried up, free from any previous cargo residue and/or loose rust/rust scales or any other foreign material(s) and ready in all respect in all compartments to load Charterers' intended cargo in accordance with relevant local independent surveyors' satisfaction. Should the vessel not be clean and ready in every respect, charterers to put the vessel off hire from time of rejection until vessel again has been accepted. All directly related expenses, including bunkers consumed, are for owners' account.

If some holds/cargo carrying compartments are not accepted, Charterers shall have the option of accepting the vessel with those which are accepted, and in that case Charterers shall pay hire proportionate to the number of holds/cargo carrying compartments, which have passed survey.

Owners warrant that the vessel's hatch covers to be water tight throughout this charter period.

### Clause 78 - Vessel's Gear

The vessel to give free use of winches/cranes in good working order and capable of lifting as per Description Clause. In the event of disabled winch or winches/crane or cranes or insufficient power to operate same, Owners to pay for shore engine or engines in lieu thereof, if required, in which case vessel not to be off-hire.

Proven stevedore standby or any proven loss of time occasioned thereby or occasioned by breakdown of vessel's gear or equipment to be for Owners' account and any such period is considered as off-hire pro rata with number of affected ship's cranes until vessel's full readiness again under this Charter-Party. In case vessel's gear breaks down Owners to employ shore cranes and vessel to be on-hire. Charterers shall employ winchmen and/or crane drivers at their risk and expense.

Vessel shall give free use, whenever required, of lights as on board to carry on night work.

### Clause 79 – Intermediate Hold Cleaning
Deleted.

### Clause 80

All cargo claims to be settled in accordance with Interclub Agreement as Amended 1984 or any later amendments.

### Clause 81

English Law to apply to this Charter Party. BIMCO Arbitration clause to apply. LMAA small claims procedure for claims not exceeding USD 50,000. General Average to be settled in London as per latest York-Antwerp rules.

### Clause 82

No drydocking under this Charter except in case of emergency.

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

### Clause 83
Owners guarantee vessel is ITF fitted.

### Clause 84
Deleted.

### Clause 85
Deleted.

### Clause 86
Deleted.

### Clause 87
No deck cargo to be allowed.

### Clause 88 - BIMCO 2020 Marine Fuel Sulphur Content Clause for Time Charter Parties

(a) For the purpose of this Clause, "Sulphur Content Requirements" means any sulphur content and related requirements as stipulated in MARPOL Annex VI (as amended from time to time) and/or by any other applicable lawful authority.

(b) The Charterers shall supply fuels to permit the Vessel, at all times, to comply with any applicable Sulphur Content Requirements. All such fuels shall meet the specifications and grades set out in this Charter Party.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers shall comply with the Sulphur Content Requirements.

The Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all losses, damages, liabilities, delays, deviations, claims, fines, costs, expenses, actions, proceedings, suits, demands arising out of the Charterers' failure to comply with this subclause (b), and the Vessel shall remain on hire throughout.

(c) The Owners warrant that the Vessel shall comply with the Sulphur Content Requirements.

Subject to the Charterers having supplied the Vessel with fuels in accordance with subclause (b), the Charterers shall not otherwise be liable for any losses, damages, liabilities, delays, deviations, claims, fines, costs, expenses, actions, proceedings, suits, demands arising out of the Owners' failure to comply with this subclause (c).

### Clause 89 - Ocean Route Clause

Charterers may supply 'Ocean Routes' or 'DWD - Deutscher Wetterdienst' advise to the Master throughout the voyage specified by the Charterers.
The Master to comply with the reporting procedure of routing service, but it is understood that final routing is always at Master's discretion for safe navigation and choice of route.
For the purpose of the Charter Party 'good weather condition' are to be defined as weather conditions in wind speeds not exceeding Beaufort force 4.
Evidence of weather condition to be taken from the vessel's deck logs and independent weather bureaus' reports. :
In the event of a consistent discrepancy both parties cooperate to find a mutual compromise (however, if weather conditions are worse than 4 Beaufort or 3 Douglas scale then vessel's achieved parameters cannot be claimed).

**ADDITIONAL CLAUSES TO TBA**
**CHARTER PARTY DATED 5TH MAY 2021**

### Clause 90 - Hatch Test

Charterers have the option to perform water hose test and/or ULD (ultrasonic leak detection) test at any time during the currency of this Charter Party. If any hatch covers found defective, same to be rectified at Owners' time/expenses.

### Clause 91 – ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both, the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

### Clause 92

Deleted.

### Clause 93

The vessel to maintain speed and consumption described in this Charter Party during the whole charter period, subject to weather conditions.

### Clause 94 - Hamburg Rule Clause

Neither the Charterers nor their Agents shall permit the issue of any Bills of Lading, Waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on Charterers' behalf or on behalf of any Sub-Charterers) incorporating, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of the Hague or Hague/Visby Rules.
The Charterers shall indemnify the Owners against liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

### Clause 95 - BIMCO ISPS/MTSA Clause For Time Charter Parties 2005

(a) (i)   The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii)   Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) (i)   The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of

**ADDITIONAL CLAUSES TO TBA
CHARTER PARTY DATED 5TH MAY 2021**

this Charter Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the Master.

Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)     Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c)   Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)   If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.

**Clause 96 - Ad Valorem Bills of Lading**
Deleted.

**Clause 97 - BIMCO Stowaway Clause For Time Charterers**
(A) (i)   The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.
(ii)     If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.
Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers account and the vessel remain on hire.
(iii)     Should the vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a) (ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

(B) (i)   If, despite the exercise of due care and diligence by the Owners, stowaways have gained
(ii)     access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the vessel shall be off-hire.
(iii)     Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

**ADDITIONAL CLAUSES TO TBA**
**CHARTER PARTY DATED 5TH MAY 2021**

### Clause 98 - OFAC

Owners guarantee and confirm the following:

(a) That the vessel is not at present and has not been at any time in the past beneficially owned, managed, operated, or controlled or otherwise by irisl or any other iranian entity, Owner, manager or operator whatsoever whether as an individual or under any corporate structure (hereafter referred to as "entity"). Beneficially owned for this purpose shall include any entity whether Iranian or not in which there is any beneficial interest as regards any shares or stockholding therein.

(b) That neither the vessel nor any other vessel in same ownership or management, nor any individuals or companies associated in any way with the ownership or management of any company defined as "SDN's" under the ofac sanctions program is currently or has been on the ofac sanctions progam or listed as an sdn, and that any shipping documents including any bills of lading, mate's receipts or other such documents are freely negotiable without restriction under the ofac program.

In case any delays occur on payment of the hire, due to Owners not complying with the above clauses (a) and (b), Charterers will not accept any responsibility.

### Clause 99

Charterers' option to breach IWL/INL limits paying additional premium as per London minimum scale less usual rebates with Owners submitting original invoices from underwriters but max USD 5000.

### Clause 100

SIDE LETTER NO.1

REFERRING TO CHARTER PARTY DATED ... BETWEEN:

POLSTEAM SHIPPING COMPANY LTD., CYPRUS, AS DISPONENT OWNERS
OF MV ......... AND .............. AS CHARTERERS

IT IS HEREBY MUTUALLY UNDERSTOOD AND AGREED THAT:

SHOULD THE ORIGINAL OF BILL(S) OF LADING NOT BE AVAILABLE FOR PRESENTATION TO THE MASTER ON ARRIVAL AT DISCHARGING PORT(S), OWNERS AND THE MASTER AGREE TO RELEASE CARGO AS AUTHORISED BY CHARTERERS, BUT CHARTERERS AGREE TO INDEMNIFY OWNER, THEIR SERVANTS AND AGENTS AND TO HOLD ALL OF THEM HARMLESS IN RESPECT OF ANY CONSEQUENCES OF SUCH AUTHORISED RELEASE OF CARGO WITHOUT ORIGINAL BILL(S) OF LADING. CHARTERERS TO PROVIDE OWNERS PRIOR TO COMMENCEMENT OF DISCHARGE WITH A LETTER OF INDEMNITY ISSUED IN ACCORDANCE WITH OWNERS P & I CLUB WORDING AND LEGIBLY SIGNED BY TWO PERSONS AUTHORISED TO SIGN SUCH LETTER ON BEHALF OF CHARTERERS. IF THE BS/L ARE NOT ISSUED TO NAMED RECEIVERS THEN FULL NAME OF THE RECEIVERS MUST BE STIPULATED IN THE L.O.I. OTHERWISE THE CARGO IS TO BE DISCHARGED TO A BONDED STORAGE AND REMAIN IN CUSTOMS CUSTODY UNTIL THE FINAL END USER PRESENTS A PROPERLY ENDORSED ORIGINAL B/L. SAME TO BE DONE FREE OF EXPENSE TO THE OWNERS."

ALL OTHER TERMS, CONDITION AND EXCEPTIONS OF THE ABOVE MENTIONED
CHARTER PARTY TO REMAIN UNCHANGED AND IN FULL FORCE AND EFFECT.'

### Clause 101- Insolvency

The Charterer shall have the right to terminate the Charter Party with immediate effect by tendering written notice to the Owner. If the Owner declares insolvency, bankruptcy, enters receivership and/or applies for any protection of a competent court similar to Chapter 11 of the United States bankruptcy code.

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

### Clause 102 - Anti-Fouling Clause

In the event the vessel stayed in a port anchorage or any other places instructed by the Charterers for more than 25 consecutive days, the Owners have the right to request Charterers bottom diver inspection and bottom cleaning if necessary by Charterers arrangement, time and expense. in case the performance of the vessel becomes worse after prolonged stay at port, anchorage or any other place instructed by Charterers compared with the same before the prolonged stay and if it is obvious that the worse performance is by the reason of bottom fouling due to the prolonged stay, Charterers shall undertake to clean the underwater part at their arrangements, time and expense to the owns satisfaction and shall not make speed/consumption claim to owns before the cleaning. Charterers' option to pay USD 20,000 in lieu of bottom cleaning.

### Clause 103

Charges regarding vessel/owner/crew nationality to be Owners' account.

### Clause 104 – Corona Virus Clause

Notwithstanding anything else in this charter party, if Charterers order the vessel to any port/s, places or countries that are considered as areas where the coronavirus outbreak (Novel Coronavirus (2019-ncov, covid-19) has been declared by the World Health Organisation, Owners are to undertake and be responsible for the implementation of all relevant measures, as recommended or directed by the World Health Organization and/or local authorities and/or the vessel's P&I insurer and/or the vessel's flag state. Any directly related costs, expenses arising out of the vessel visiting an affected area shall be for Charterers' account and the vessel shall remain on hire throughout.

Owners confirm that on delivery and arrival first load port all vessel crew members will be free of infection of coronavirus. In the event that on delivery or arrival first loadport any member of the crew or persons on board the vessel is found to be infected with a highly infectious or contagious disease and the vessel has to (i) deviate, (ii) be quarantined, or (iii) barred from entering any port, all time lost, delays and expenses whatsoever shall be on Owners' account.
In such case Charterers shall not be responsible for any delays, costs, expenses or liabilities whatsoever or howsoever incurred as a result of (i) the vessel having a crew member or person on board found to be infected with a highly infectious or contagious disease.

### I. BOTH - TO - BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### BOTH - TO - BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servant of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

### II. GENERAL AVERAGE AND NEW JASON CLAUSE

General Average shall be payable according to the latest York/Antwerp Rules, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, to be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery."

and the Charterers shall procure the all Bills of Lading issued under this Charter Party shall contain the same clause.

### US CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE FOR TIME CHARTER PARTIES

(a)     If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)       Have in place a SCAC (Standard Carrier Alpha Code);
ii)      Have in place an ICB (International Carrier Bond);
Provide the Owners with a timely confirmation of i) and ii) above; and
Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b)     The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c)     If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)     The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

### WAR RISKS CLAUSE FOR TIME CHARTERS, 2004 (CODE NAME: CONWARTIME 2004)

(a)     For the purpose of this Clause, the words:
(i)      "Owners" shall include the shipOwners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)     "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively

## ADDITIONAL CLAUSES TO TBA
## CHARTER PARTY DATED 5TH MAY 2021

against vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)      The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)      The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d)      (i)      The Owners may effect war risks insurance in respect of the Hull and  Machinery of the Vessel and their other interests (including, but not  limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)      If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)      If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or  upon redelivery, whichever occurs first.

(f)      The Vessel shall have liberty:
(i)      to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)      to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)      to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)      to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)      to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g)      If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

**ADDITIONAL CLAUSES TO TBA**
**CHARTER PARTY DATED 5TH MAY 2021**

(h)      If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**OWNERS**                                                                                  **CHARTERERS**